LEMMON, Judge.
The sole issue in this appeal is whether the evidence supports the amount of the judgment awarded plaintiff for damages to computer equipment sustained because of an overhead water leak in the office leased from defendants.
During the evening of October 13, 1971, water leaked from the ceiling of plaintiff’s computer room onto plaintiff’s equipment. Determining that the computers had to be replaced, plaintiff immediately secured temporary replacement machines and eventually purchased new equipment. This suit is for the value of the replaced computers and the cost of programming the new system, in addition to the cost of miscellaneous supplies and equipment.
Prior to trial defendants admitted liability for plaintiff’s reasonable damages and limited the issue to the extent of those damages, if any. In effect, defendants principally questioned the reasonableness of replacing the computers, contending the equipment was only slightly damaged and easily repairable and disputing plaintiff’s contention that the water damaged equipment was worthless for its intended use.
Plaintiff was in the international freight forwarding business, representing exporters in preparing documents for transportation of products from the factory to the final destination. The business, complex because of problems in language, financing, interpretations of customs law, and cargo specifications for securing of proper rates, required extraordinary accuracy in preparing the shipping documents, which were actually made by the computers.[1] Since plaintiff’s principal customers shipped very expensive heavy equipment and industrial chemicals to South American countries which imposed virtually confiscatory fines for erroneous shipping documents (even for innocent error), absolute accuracy in document preparation was essential to plaintiff’s business existence.
Plaintiff had purchased two Model 5610 computers with auxiliary equipment from Singer Business Machines in January, 1971 and had placed the equipment on line in June or July. During the interim plaintiff’s employees were trained to create and use the system and thereafter prepared computer cards and created massive storage of data for use at a given time with a given function. The employees also verified the reliability of the system by running parallels which were processed manually. During the time that the system was in operation, no inaccurate documentation occurred, although Singer was frequently called upon to service the equipment for mechanical problems.
*786 On the morning the leak was discovered, a Singer serviceman inspected the equipment but did not disassemble the machines or test them in any manner. While he did not take the panels off, he did slide the drawer out, exposing the panels, and observed “water in there dripping”.
Singer’s regional assistant manager opined, from the serviceman’s description, that it was not possible to remove all of the dampness and moisture from the electronic components and that once the water was in the equipment for that length of time, “the damage has been done”. He specifically denied that the electronic components could withstand the heat necessary to remove moisture, although he admitted that most of the mechanical parts of the typewriter could possibly have been salvaged by action immediately after exposure to the water. He also conceded that the equipment possibly could have been reconditioned and placed back in service, but that many problems would be expected, ranging from mechanical problems to printout errors. In the event of reconditioning, Singer would have warranted parts and labor, but would not have guaranteed performance.
Singer’s district manager, in testifying as to value, stated that equipment damaged by water or fire has no trade-in value and that the company had no use for the machine’s separate salvageable parts, since the machines were sold only as units.
Plaintiff’s executive vice-president inspected the room with defendants’ building manager on the morning the leak was discovered. Plaintiff’s officer testified that water was still leaking from the ceiling “falling right on the machine”, that 75% of the ceiling was leaking, and that since the floor was totally covered with water, the building manager would not allow anyone in the office until the Singer serviceman removed the danger of electrical shock. He stated that the Singer serviceman opened the machine and pointed out water to him, and he concurred with the observations related by the serviceman in earlier trial testimony. Defendants’ building manager did not take the stand to rebut this testimony as to the condition of the room and equipment on that morning.
Defendants presented a consulting electrical engineer who had examined the equipment 19 days after the casualty and after the equipment had been moved into another room. The engineer testified that he did not find any moisture, corrosion or other evidence that water had entered the machines, stating there were only a few slight stains on the tops of the cabinets. He did observe dust in the interior of the machines. He further observed that only a few square feet of ceiling evidenced water damage. Photographs of the ceiling and the exterior and interior of the machines supported this testimony. He summarized the only defects observable as some sloppy solder joints and some relays out of socket.
The engineer and the electronic technician who accompanied him testified further that computers exposed to water could be disassembled and cleaned and that the electronic components could be dried out, although neither had ever baked the components of a Singer computer.
The presence and extent of water in the room and inside the equipment on the morning the casualty was discovered is an issue of fact, which was resolved by the trial judge in plaintiff’s favor. The testimony on this point of plaintiff’s officer and of the Singer serviceman was not specifically denied by defendants’ building manager, who was then present, and was only inferentially denied by the testimony and photographs of defendants’ experts, who were not there until 19 days later. We conclude that the trial judge’s resolution was supported by the record.
Once the factual dispute as to the extent of water invasion is thus resolved, the basic dispute remaining is whether electronic *787 components exposed in this manner can be relied upon after repair to the degree of accuracy required by plaintiff.
Plaintiff’s officer testified that Singer originally guaranteed the mathematical functions of the equipment, but did not warrant against mechanical failure beyond the period of express warranty, during which time Singer had furnished labor and materials to correct mechanical problems. As to the computer’s mathematical functions before the casualty, he stated that “if it is given a wrong answer it will stop functioning before it would give you the wrong information.”
This testimony, together with the testimony of Singer’s serviceman and regional assistant manager that moisture could not be removed from Singer’s electronic components, supports the trial judge’s apparent finding that the equipment could not be repaired so as to insure the degree of accuracy required in plaintiff’s business. We find no manifest error in the trial judge’s rejection of the squarely opposite opinion testimony given by defendants’ experts, who were no more or less qualified than the experts presented by plaintiff and who had never repaired Singer computers.
When Singer was not willing to stand behind the electronic functions of water damaged equipment, plaintiff reasonably concluded that the equipment had to be replaced, since equipment of questionable accuracy was of no value in plaintiff’s operation. Singer would not take the water damaged computers in trade, and plaintiff thus realized no salvage value.
It would be unreasonable for a court to require a tort victim to run the business risk of using equipment of questionable accuracy, against the advice of the manufacturer, in order to reduce the damages due by the tortfeasor. If plaintiff had done so and sustained a shipping fine greater than the value of the computers, defendants could have contended in a subsequent suit for damages that plaintiff was unreasonable in taking this risk against the manufacturer’s advice.
Furthermore, the equipment was not shown to be salvageable for other purposes, plaintiff’s evidence being that Singer considered the equipment worthless and defendants’ evidence being that minor repairs would make the equipment useful for any purpose. Defendants offered no suggestion of a salvage market for water damaged computers, and their defense depended entirely on their contention that the computers were repairable.
We conclude that plaintiff proved the constructive destruction of the equipment, which after the casualty was worthless for its intended use. The substantial salvage value urged by defendants (as a corrollary of the theory that the computers were repairable) can be realized by defendants’ sale for salvage, without risk to plaintiff’s business operations.
Since the trial judge’s award of $50,461.09 was not itemized, we must review the claim item by item. In brief plaintiff asserted the following damages had been proved at trial:
Value of computer and auxiliary equipment $33,950.00
Carpets 114.69
Books and supplies 550.00
Replacement and verification of 10,400 tapes and cards $ 9,048.00
Costs of rebuilding, etc. 6,798.40
Salaries of two operators 10,039.91 25,886,31
Total $60,501.00
The two computers had an expected service life of seven to ten years and had been in use for four months. Plaintiff had paid $15,250.00 for each computer in April, 1971, but conceded that the price had dropped to $12,990.00 when the damage occurred in October. Using the lower figure and adding the $2,735.00 cost of auxiliary equipment for each computer and the overall charge of $2,500.00 for Singer’s assistance in coding, instructing and documenting the computers, we conclude the record *788 supports an award of $33,950.00 for that portion of the claim.
The expense of $114.69 for replacing the carpets was supported by the evidence. However, no evidence was offered as to the claim of $550.00 for books and supplies, and this portion of the claim should have been denied.
The next item was replacement and verification of 10,400 tapes and cards at 87 cents each, or $9,048.00. Plaintiff’s officer admitted that 300 to 500 cards for the Caterpillar account and another 600 tapes attached to the bulletin board were not damaged. We therefore subtract $870.00 (for 1,000 cards) from $9,048.00 and allow $8,178.00 for this item.
The next item was the cost of rebuilding, design form controls, sequential stations procedure, implementation training and parallel runs. The original claim was $9,712.00, calculated on the basis of 800 hours at $12.14 per hour. Plaintiff’s officer admitted at trial that approximately 240 hours involved training which had already been accomplished when the equipment was originally installed, and he reduced the claim to $6,798.40. An award in that amount was supported by the record.
The final element of the claim was $10,039.91 for the salary of two operators who physically recreated the file. This item was apparently denied by the trial judge.[2] Possibly the trial judge reasoned these operators were on regular salary and thus this item was not a non-recurring expense attributable to the casualty. In any event plaintiff did not seek modification of the judgment which denied this item.
For these reasons, the judgment of the trial court is amended to decrease the award to $49,041.09. As amended, the judgment is affirmed.

AMENDED AND AFFIRMED

. Plaintiff’s executive vice-president, over a period of seven years, designed and created the layouts for direct functions, which were then given to the programmer (Singer) for coding.

. The difference between the total amount claimed to be proved ($60,601.00) and this particular item of the claim ($10,039.91) was $60,461.09, the exact amount of the judgment. This indicates the trial judge disallowed this particular item,.